## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTICT OF ILLINOIS

Jane Doe D.B.,

      Plaintiff,

      v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah Corporation;
THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah Corporation;
DOUGLAS HOLYOAK, an individual; AND
MICHAEL EVANS, an individual.

      Defendants.

Case No.

**PLAINTIFF DEMANDS A JURY TRIAL**

## COMPLAINT AT LAW

Jane Doe D.B. ("Plaintiff") respectfully brings this Complaint against The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints ("COP"), The Church of Jesus Christ of Latter-Day Saints ("LDS" or, collectively with COP, the "LDS Church Defendants"), Douglas Holyoak ("Bishop Holyoak"), and Michael Evans ("President Evans") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.    The LDS church claims to care for its members, yet it has gone to great lengths to cover up its extensive history of abusing children. Much like the Catholic Church, the LDS Church has long been aware that a disturbing number of its church officials have regularly sexually abused children. Rather than rooting out these bad actors and helping bring them to justice, the LDS Church has taken no action to protect these vulnerable children or reprimand the abusers that run

1

its churches. Even worse, the LDS Church has engaged in systematic efforts to protect and immunize its ranks of pedophiles from reproach and criminal prosecution—instead turning the blame on the very children who have been victimized. As a direct and naturally foreseeable result of these practices, Bishop Douglas Holyoak, a respected leader of the Sycamore Ward of the church sexually assaulted Plaintiff.

2.    When Plaintiff was only fifteen (15) to sixteen (16) years old, she was subjected to repeated sexual harassment by youth members of the LDS Church. Plaintiff sought help from Bishop Holyoak, but instead of protecting Plaintiff and reprimanding the LDS youths, Bishop Holyoak made things worse—taking sexual harassment to sexual assault. He touched Plaintiff's breasts without her consent, while insinuating that the boys sexually harassing Plaintiff were justified in their behavior because of the size of her breasts. When Plaintiff attempted to seek reprieve from Bishop Holyoak's abuse, she was ignored and dismissed by other LDS Church members, including, but not limited to, President Michael Evans. Doubling down on their pattern of victim-blaming, Bishop Holyoak and President Evans blamed Plaintiff for any abuse she experienced and told her that she must "control her urges" and "behave" herself.

3.    Plaintiff suffered emotionally and physically for years following this repeated abuse and harassment. Plaintiff struggled with severe bulimia, depression, and suicidal ideation—even going so far as to attempt suicide. Unfortunately, it was not until several years later that Plaintiff began to understand that the emotional and physical pain she suffered was a direct result of Bishop Holyoak's abuse, and the LDS Church's systematic repression of her abuse. Having internalized the misogynistic attitudes foisted upon her by the LDS Church, Plaintiff blamed herself for years and was convinced that her abusers did nothing wrong. It was only recently that she made the connection between her years of self-hatred and grief and the abuse and subsequent

degradation she suffered at Defendants' hands.

4.      This suit aims to hold Defendants accountable and shed light on the blatant exploitation of youth parishioners by clergy members who abuse their religious reverence and the LDS Church's extensive history of suppressing allegations of such abuse.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over the entire action because this is a civil action between citizens of different states, wherein the matter in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has specific personal jurisdiction over all Defendants in this matter because they purposely availed themselves to the laws of Illinois by conducting business in Illinois, specifically, their conduct and actions giving rise to Plaintiff's claims took place in Sycamore, Illinois. *See* 735 ILCS 5/2-209(a)(2). The Court has general personal jurisdiction over Defendants COP and LDS because they own and operate LDS Churches across the state of Illinois. *See* 735 ILCS 5/2-209(b)(4).

7.       Venue is proper in this Court pursuant to 28 U.S.C. § 1332, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

8.      Plaintiff Jane Doe D.B. is over the age of 18 and a resident of the State of Arkansas. At all relevant times herein, Plaintiff was a minor and resident of the State of Illinois. The incidents at issue herein took place in Sycamore, Illinois.

9.      Plaintiff files this action under a pseudonym because, as a victim of childhood sexual assault and harassment, she needs anonymity to protect her privacy in this sensitive and highly personal matter. Plaintiff proceeds in this manner to protect her legitimate privacy rights.

Disclosure of her name would expose her to stigmatization, unnecessarily invade her privacy, and make her vulnerable to retaliation. For these reasons, Plaintiff's needs for anonymity outweigh both the prejudice to Defendants and the public's interest in knowing her identity. Counsel for Plaintiff has informed Defendants of Plaintiff's full name and the circumstances surrounding these causes of action. Plaintiff is concurrently filing a motion for leave to proceed pseudonymously, based on such good cause, and further anticipates seeking concurrence from Defendants for entry of a protective order to prevent the unnecessary disclosure of Plaintiff's identity in the public record.

10.     Defendant The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints ("COP") is a corporation solely organized and incorporated in the State of Utah. Defendant COP functionally operates the LDS Church's meeting houses, congregations, wards, and parishes within the State of Illinois, including DeKalb County.

11.     Within the LDS Church, congregations are referred to as "wards" and are overseen by a Bishop. In this way, a Bishop is analogous to a pastor in Catholicism. A group of wards in a geographical area create a "stake," which is comparable to a Catholic diocese. Each stake is overseen by a "stake president," which is akin to a bishop in Catholicism.

12.     At all relevant times herein, Plaintiff was a member of the "Christian Church in Sycamore" ("Sycamore Ward"), located in Sycamore, Illinois. Upon information and belief, COP owns and operates the Sycamore Ward.

13.     Defendant The Church of Jesus Christ of Latter-Day Saints ("LDS") is a corporation organized and incorporated in the State of Utah, which upon information and belief, has the authority to acquire, hold, donate, or otherwise convey LDS property.

14.     Defendants COP and LDS are collectively referred to as the "LDS Church

Defendants."

15.     The foregoing acts were committed for no purpose other than to protect members, officials, and leaders of the LDS Church at the expense and suffering of vulnerable and defenseless children, including Plaintiff. The LDS Church's actions actively embraced and fostered a culture of sexual abuse against individuals to whom it owed a heightened duty to protect, including Plaintiff.

16.     Defendant Douglas Holyoak is a resident of the State of Utah. At all times relevant herein, Defendant Holyoak was a resident of the State of Illinois and served as a Bishop at the Sycamore Ward. The Mormon Church appoints a Bishop to control and oversee each ward. In this way, a presiding Bishop is subject to the direct and absolute control of the LDS Church Defendants.

17.     Defendant Michael Evans is a resident of the State of Idaho. At all relevant times herein, Defendant Evans was a resident of the State of Illinois and served as the Stake President of the Rockford Illinois Stake, which encompassed several LDS wards, including the Sycamore Ward. A Stake President is responsible for overseeing and supervising the wards within his stake and must follow the procedures and doctrines of the LDS Church. In this way, a Stake President is subject to the direct and absolute control of the LDS Church.

18.     Plaintiff is informed and believes, and on this basis alleges, that at all relevant times, Defendants COP, LDS, Bishop Holyoak, and President Evans were the agents, representatives and/or employees of each and every other Defendant. In doing the things hereinafter alleged, Defendants—and each of them—were acting within the course and scope of said alternative personality, capacity, identity, agency, representation, and/or employment and were within the scope of their authority, whether actual or apparent.

## STATUTE OF LIMITATIONS

19.     Illinois Compiled Statutes Section 13-202.2 governs the statute of limitations for civil claims arising out of allegations of childhood sexual abuse. *See* 735 ILCS 5/13-202.2. This law has been amended several times over the course of the last two decades, continuously recognizing the importance of giving survivors of childhood sexual abuse the opportunity to present their claims and seek redress for their harm. The amendments to Section 13-202.2 recognize that it often takes survivors years to come to terms with their abuse and feel ready to confront their abuser.

20.     Plaintiff was sexually assaulted by Defendant Holyoak in 2000. At that time, the civil statute of limitations for child sexual assault claims was two years from the date the Plaintiff gained majority, *or* two years after the Plaintiff discovers *both* the abuse and the causal relationship with his or her injuries.

21.     Plaintiff turned eighteen (18) years old in November 2002, giving her a minimum of two years from that date to file suit. In 2003, however, the statute was amended, giving survivors of childhood sexual assault ten (10) years to file suit after turning 18. Plaintiff thus had until November 2012 to file suit.

22.     In 2011, however, the statute was again amended, extending the statute of limitations to twenty (20) years after the age of majority. Plaintiff therefore had until November 2022 to file. Importantly, the statute was amended yet again in 2013 to completely eliminate the statute of limitations for bringing a civil claim for sexual assault, provided the plaintiff was born after July 24, 1983. *See* 735 ILCS 5/13-202.2(f). Because Plaintiff was born after that date, her claims herein are not subject to any statute of limitations and are timely.

## GENERAL FACTUAL BACKGROUND

### *History of Abuse in the LDS Church*

23.     It is well-known that childhood sexual abuse is a serious issue that plagues the LDS Church. Over the years, hundreds—if not thousands—of survivors have come forward exposing the abuse they experienced within the Church's walls or at the hands of trusted Church leaders.[1] This lengthy history of abuse dates back to well before Plaintiff's abuse at the Sycamore Ward.[2]

24.     Not only have members of the LDS Church repeatedly subjected children within its wards to sexual abuse, but the Church as an institution has also gone to extreme lengths to suppress reports of abuse. Most notably, in 1995 the LDS Church established a 24/7 confidential "help line" that's sole purpose was to contain allegations of sexual abuse within the LDS Church.[3]

---

[1] *See, e.g.,* Jeremy Harris, *Mormon Church Child Leader Admits to Sex Abuse at Sleepovers he Hosted*, ABC 7 (June 14, 2022) https://katv.com/news/nation-world/mormon-church-child-leader-admits-to-sex-abuse-at-sleepovers-he-hosted-sexual-assault-child-abuse-psychosexual (a man who taught primary in a congregation of the LDS Church in West Jordan, Utah admitted to sexually abusing a girl from his ward); *$2.3 Billion Awarded in Sexual Abuse Case Involving Morning Church—but they Settled out Months Ago for $1 Million*, ASSOCIATED PRESS (April 28, 2023, https://fortune.com/2023/04/28/2-3-billion-sexual-abuse-case-jury-verdict-mormon-church-latter-day-saints/) (a woman who was molested as a child by her step-father on the property of her local Lake Elsinore LDS Church achieved a verdict in her favor); Christopher Smart, *Children's Charity Co-Founder Sentence in Sex Abuse Case*, THE SALT LAKE TRIBUNE (Nov. 3, 2011), https://archive.sltrib.com/article.php?id=17798173&itype=storyID (former LDS bishop was convicted of sexually abusing his adopted children for years); Gene Kennedy, *Former LDS Bishop Pleads Guilty to Sex Abuse*, KSL.COM, (Sept. 24, 2008), https://www.ksl.com/article/4355348 (former LDS bishop in Harrisville, Utah pled guilty to abusing several children in is church ward).

[2] A Mormon whistleblowing organization, Mormon Leaks, created a report compiling the publicly made allegations of child sex abuse in the Mormon church. The allegations of abuse date back to 1959. Compiled by Deborah J, Diener, *Instances of Child Sexual Abuse Allegedly Perpetrated by Members of The Church of Jesus Christ of Latter-Day Saints*, MORMON LEAKS, https://mormonleaks.io/wiki/documents/6/60/INSTANCES_OF_CHILD_SEXUAL_ABUSE_ALLEGEDLY_PERPETRATED_BY_MEMBERS_OF_THE_CHURCH_OF_JESUS_CHRIST_OF_LATTER-DAY_SAINTS-2017-06.pdf, (last visited April 5, 2024).

[3] Michael Rezendez, *Seven Years of Sex Abuse: How Mormon Officials Let it Happen*, THE ASSOCIATED PRESS (Aug. 4, 2022) https://apnews.com/article/mormon-church-sexual-abuse-investigation-e0e39cf9aa4fbe0d8c1442033b894660.

Church policy dictates that officials, including stake presidents and bishops, "promptly call the help line about every situation in which a person may have been abused – or is at risk of being abused."[4] Church policy further instructs officials across all stakes and wards to seek guidance from the help line on handling situations of abuse or suspected abuse.[5] The help line is staffed by social workers who destroy records of all calls at the end of each day.[6] When the social workers receive a call about abuse that presents a risk to the Church, such as abuse perpetrated by a Church leader, they refer the call to attorneys for the LDS Church.[7] The attorneys then instruct callers not to report the abuse to law enforcement or child welfare officials.[8] In fact, the attorneys strictly advised the callers to do *nothing* about the alleged sexual abuse.[9] Although the Church leaders were obligated to report allegations of abuse, LDS attorneys would inform the leaders that they were exempted from reporting due to the protections of clergy/penitent privilege or attorney/client privilege.[10]

25.     In one particularly egregious example, a member of the LDS Church confessed that he had been raping his five-year-old daughter during a counseling session with his Bishop.[11] After he learned of the abuse, the Bishop followed Church policies and called the help line.[12] When he called, the LDS attorneys told the Bishop that he "absolutely can do nothing" about the sexual

---

[4] *Abuse Help Line*, The Church of Jesus Christ of Latter-Day Saints, https://www.churchofjesuschrist.org/callings/church-safety-and-health/abuse-help-line (last visited July 25, 2024).

[5] Rezendez, *supra* note 3.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] Peggy Fletcher Stack & Tamarra Kemsley, *Does the LDS Church's Sex Abuse Help Line Protect the Faith or the Victims? Debate Continues*, THE SALT LAKE TRIBUNE (Aug. 15, 2022), https://www.sltrib.com/religion/2022/08/15/whom-does-sex-abuse-help-line/.

[11] Rezendez, *supra* note 3.

[12] *Id.*

abuse and that he was legally bound to keep the abuse a secret because he learned of the abuse during a counseling session, which the Church considers a "spiritual confession."[13] Because the LDS Church failed to intervene or report the abuse, the Church member continued to rape his daughter for another seven years and even went on to abuse a second daughter.[14] The abuse continued until Homeland Security arrested the Church member—without any help from the LDS Church.[15]

26.     The true nature of the "help line" was revealed when the Associated Press obtained nearly 12,000 pages of sealed records from a separate lawsuit against the LDS Church, for allegations of child sex abuse arising out of a ward in West Virgina.[16] The records revealed that the help line was part of an overarching system within the LDS Church to divert allegations of abuse away from law enforcement and toward Church attorneys, who could handle the issues internally.[17] In sworn statements, LDS Church officials confirmed that the social workers who staffed the help line do in fact *destroy* records of all calls at the close of every day.[18]

27.     The LDS abuse help line was and is available to all LDS leaders, 24 hours a day, seven days a week to bishops and stake presidents.[19]

28.     Additionally, there have been several reports of LDS Church leaders who have actively discouraged Church members from reporting allegations of abuse and utilized manipulation tactics, such as shaming and gaslighting, to prevent them from doing so. One San Diego woman spoke up, demanding answers as to why the leaders of her LDS Church turned a

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Abuse Help Line*, *supra* note 4.

blind eye to the sexual abuse she endured as a child.[20] She said that in 1988 when she and her mother informed the Church leaders that her father, an LDS elder, had molested her, the Church leaders discouraged her from reporting the abuse to the police.[21] In turning a blind eye to the abuse, the LDS Church allowed the abuse to continue for 13 years.[22] Another sexual abuse survivor came forward and shared that the LDS Church frequently resorted to "intimidation and shaming tactics" to prevent her from speaking up about the abuse she repeatedly endured.[23]

29.    Further, across the United States, civil and criminal charges have repeatedly been brought against LDS Church leaders for failing to report known allegations of child sexual abuse within their wards.[24]

30.    The LDS Church's policies redirecting and suppressing allegations of abuse is further evidenced by Plaintiff's experience, as detailed herein. When Plaintiff reported the assault by Bishop Holyoak, both Bishop Holyoak and Stake President Evans belittled and dismissed her. Rather than take appropriate and corrective action, Bishop Holyoak told Plaintiff's parents that Plaintiff should see a mental health therapist, specifically an LDS therapist. Further, when Plaintiff reported the harassment she suffered to Sister Mel, a female member of the church who ran the Youth Program. Sister Mel explicitly told Plaintiff that accusations regarding male members of

---

[20] Dorian Hargrove, Carlo Cecchetto & Jon Stinebaugh, *Lawsuit: Mormon Church Leaders in San Diego Turned a Blind Eye to a Report of an Eldor Molesting his Daughter*, CBS 8 (Nov. 14, 2022), https://www.cbs8.com/article/news/investigations/woman-says-mormon-church-leaders-in-san-diego-failed-to-protect-her-from-sexual-abuse/509-fe7118ee-f39b-4136-a32f-d74200fe096a.

[21] *Id.*

[22] *Id.*

[23] *$2.3 Billion Awarded…*, *supra* at note 1.

[24] *See, e.g.,* Aubree B. Jennings, George Stockburger & Seth Kaplan, *LDS Church Leader Faces Felony After Pennsylvania Police Say He did not Report Child Rape Allegations*, ABC 4 (Feb. 1, 2024), https://www.abc4.com/news/national/lds-church-leader-faces-felony-after-pennsylvania-police-say-he-did-not-report-child-rape-allegations/ (Pennsylvania LDS Church state president failed to report the sexual assault allegations of another LDS church leader in his stake).

the Church had to be directed to the male bishop.

31.     These instances of abuse and the lengths that LDS Church leaders would go to cover-up these allegations establish that: (1) Defendants COP and LDS were aware of the risks of childhood sexual abuse in its wards, and (2) the LDS Church lacked policies and procedures to ensure safe and effective reporting of childhood sexual abuse.

### *Duty*

32.     A special relationship exists between a church, its religious leaders, and its parishioners. Parishioners are encouraged to trust religious leaders' knowledge, prudence, experience, and character, and are taught to view these individuals as an extension of God, or other religious beings. Religious leaders are held in extremely high regard because of the very role they occupy within the larger church organization. The authority and reverence are bestowed upon them by the religious organization.

33.     At all relevant times herein, as a member of the LDS Church, Plaintiff placed her trust and confidence in the LDS Church and its Presidents and Bishops, at those leaders' request. By holding out its leaders and hierarchal members as its agents, whom the LDS Church placed in positions of authority and responsibility over members of the church, including Plaintiff, Defendant LDS Church entered a special and fiduciary relationship with Plaintiff wherein Defendant LDS Church owed Plaintiff a heightened duty to protect Plaintiff from foreseeable harm. As such, a special relationship existed between the LDS Church, including its religious leaders, and Plaintiff, wherein the LDS Church and its leaders owed Plaintiff a heightened duty of care.

34.     By hosting the Youth Program at the Sycamore Ward, Defendants voluntarily assumed the care, supervision, and responsibility of all youth members who attended the program,

11

including Plaintiff. As such, Defendants, and each of them, owed a duty to protect Plaintiff, and all other minor children that attended the Youth Program, from foreseeable harm.

35.     Additionally, a special relationship of employer-employee and/or principal-agent exists between a religious organization and its leaders, including Bishop Holyoak and President Evans. This is because the religious organization has the ability to exercise control over the clergy it selects to work within its wards. As such, at all relevant times herein, a special relationship employer-employee and/or principal-agent existed between the LDS Church and Defendants Holyoak and Evans.

### *Sexual Abuse against Plaintiff*

36.     In 1999, when Plaintiff was fourteen (14) years old, Plaintiff and her family moved to Sycamore, Illinois. There, Plaintiff became an active member of the Sycamore Ward. Between 1999 through 2001, Plaintiff experienced multiple instances of sexual assault and harassment at the hands of members of the Sycamore Ward.

37.     Before the incident of sexual abuse, several male members in the Youth Program at the Sycamore Ward repeatedly bullied, ridiculed, and sexually harassed Plaintiff. The harassment centered around Plaintiff's physical appearance, particularly, her developing breasts. Having developed sooner than many other girls her age, Plaintiff felt insecure about the size of her breasts, even before the harassment started.  When Plaintiff could no longer cope with the male youth members' degrading behavior, she decided to report their behavior to Bishop Holyoak.

38.     On a Wednesday evening in 2000, Plaintiff attended the Youth Program at the Sycamore Ward and went to Defendant Holyoak's office to speak with him about the harassment. Instead of reassuring Plaintiff, offering recourse, or ensuring her safety, Defendant Holyoak endorsed the male members' inappropriate behavior.  Defendant Holyoak told Plaintiff that the

12

male youth would not make such offensive comments "if her breasts were not so big." Defendant Holyoak blamed Plaintiff for the harassment she endured and blatantly told her that her breasts were a "distraction" for the male youths at the Sycamore Ward. Defendant Holyoak then reached over and slapped Plaintiff's breasts.

39.     As an insecure and developing young teenager, Plaintiff was filled with shame and embarrassment. She immediately started crying, not only because Defendant Holyoak was a religious figure she admired and respected, but because he ratified the male youths' inappropriate behavior towards Plaintiff. Defendant Holyoak feigned shock at the sight of Plaintiff's tears and said he did "not understand what was going on."

40.     The next Wednesday, Plaintiff decided to reach out to the Stake President, Defendant Evans. Plaintiff told Defendant Evans that Defendant Holyoak sexually assaulted and harassed her the preceding week. Defendant Evans then told Plaintiff to wait in his office. When Defendant Evans returned, he did so with Defendant Holyoak. The two men proceeded to lie to Plaintiff, telling her that nothing had happened—despite her having personally experienced and described the harassment and assault.

41.     Defendant Evans pulled Plaintiff aside and told her that "nothing happened" and that Bishop Holyoak never touched her as she claimed. Defendant Evans also told Plaintiff that she needed to conduct herself as a young lady and "control her urges." Plaintiff again tried to explain that Defendant Holyoak sexually assaulted her, but Defendant Evans dismissed Plaintiff and ordered her to "behave" herself.

42.     Defendant Holyoak and Defendant Evans added that any harassment Plaintiff experienced at the hands of male youths occurred because she dressed "promiscuously." Obviously, this is not an appropriate excuse for sexual harassment of a child, and Defendants'

suggestion otherwise was inappropriate and abusive. Moreover, it was factually inaccurate. These comments deeply upset Plaintiff as she routinely made concerted efforts to cover her developing body and avoid sexual attention. For example, when Defendant Holyoak assaulted Plaintiff, she was wearing an oversized men's shirt, jeans, and tennis shoes.

43.     Approximately one year later, a male youth member again sexually harassed Plaintiff, which Plaintiff tried to report to Sister Mel, an adult LDS Church member who supervised the Youth Program. Unfortunately, Sister Mel informed Plaintiff that because the situation involved a male Church member, Bishop Holyoak needed to address the issue. Although Plaintiff did not want to discuss the matter with Defendant Holyoak, she was desperate for help. Out of pure desperation, Plaintiff went to Defendant Holyoak's office to report the harassment.

44.     When Plaintiff arrived at Defendant Holyoak's office, he shut the door behind her, isolating them in his office. After Plaintiff explained the harassment by the youth member, Defendant Holyoak responded that he would not help Plaintiff given her "failed attempt" to have him "shunned." Plaintiff felt defeated and left Defendant Holyoak's office.

### *Notice – Foreseeability*

45.     At all relevant times herein, Defendants Holyoak and Evans were LDS Church officials and/or other LDS Church agents under LDS Church's control, management, and supervision. In this way, Defendants COP and LDS were responsible for the supervision, management, and retention of Defendants Holyoak and Evans.

46.     At all relevant times herein, Defendants COP, LDS, and Evans knew, or in the exercise of reasonable care should have known, that Plaintiff was particularly vulnerable and susceptible to sexual abuse and harassment at the hands of Defendant Holyoak. Specifically, because of Defendant Holyoak's role as Presiding Bishop, authority, age, and unfettered access to

minors in the Youth Program at the Sycamore Ward, it was reasonably foreseeable that Defendant Holyoak would commit acts of sexual abuse or harassment on minors under the care and supervision of the LDS Church.

47. Before the sexual abuse against Plaintiff, the LDS Church Defendants knew or should have known, or were otherwise put on notice of conduct, including the allegations herein, that would put a reasonable person on notice of Defendant Holyoak's propensity to sexually abuse, harass, and molest minors.

48. Further, the LDS Church Defendants knew or should have known that there was a systematic failure of supervision and management of its officials and agents throughout LDS wards and stakes due to the lengthy history of sexual abuse within the LDS Church. Based on the pervasiveness of sexual abuse within the religious organization, especially between LDS Church leaders and parishioners, the LDS Church Defendants knew or should have known that its leaders were reasonably likely to engage in such abusive behavior against parishioners.

49. At all relevant times herein, the LDS Church Defendants knew or should have known that they did not have reasonable safeguards in place to adequately protect its minor parishioners, including Plaintiff, from sexual abuse and harassment. Absent adequate safeguards and reporting policies and procedures, it was reasonably foreseeable to the LDS Church Defendants that such acts of sexual abuse and harassment would occur.

***Breach***

50. Illinois courts have established that the existence of a special relationship alone is sufficient to establish a duty to protect from third-party negligence. As previously stated, at all relevant times herein, there was a special relationship of clergy/parishioner between Plaintiff and Defendants. As such, Defendants, and each of them, had the affirmative duty to protect Plaintiff

from the sexual assault and harassment she experienced at the Sycamore Ward.

51.     At all times relevant and material herein, the LDS Church Defendants failed in all aspects of their obligations, including in the supervision and retention of Defendant Holyoak, as detailed herein. Included in these failures, the LDS Church Defendants failed to:

a.  Reasonably supervise and monitor minor children attending the Youth Program;

b.  Protect Plaintiff from harm that could result from a lack of supervision, such as sexual harassment by other youth members;

c.  Provide Plaintiff with a safe church environment where she would not be subjected to sexual assault and continuous sexual harassment;

d.  Establish and implement adequate programs, policies, and procedures in the exercise of reasonable care for the protection of minor children in the LDS Church's care and the prevention of inappropriate sexual conduct;

e.  Establish and implement adequate programs, policies, and procedures to ensure that reports of sexual harassment and assault are investigated and addressed, such that corrective actions are taken and an individual is not repeatedly subject to the same form of harassment and assault;

f.  Adequately train its clergy officials and employees in said programs, policies, and procedures; and

g.  Supervise and monitor the LDS Church Defendants' clergy officials and employees, such to ensure their adherence to such programs, policies, and procedures and the overall safety of its church wards.

52.     By failing to adequately monitor the youth members in the Youth Program,

Defendants allowed Plaintiff to be subject to repeated sexual harassment by other youth members. The response to Plaintiff's multiple attempts to report her harassment and abuse illustrates that there was a practice within the LDS Church of suppressing reports of harassment and abuse. Had the LDS Church ensured that its clergy officials were following safe policies and procedures, the leading figures at the Sycamore Ward would not have been able to continuously suppress Plaintiff's reports, now would Defendant Holyoak been able to sexually assault Plaintiff.

53.     At all relevant times herein, the LDS leaders' actions and inactions alleged herein occurred within the scope of their employment and/or agency with the LDS Church Defendants and while acting within their roles as selected leaders of the LDS Church.

54.     Included in the failures and breaches of the LDS Church Defendants, as detailed with greater specificity herein, Defendant Holyoak was:

      a.   Allowed to have unfettered access to minors at the Sycamore Ward under his care and supervision, including Plaintiff;

      b.   Allowed to be alone with minors at the Sycamore Ward, including Plaintiff;

      c.   Allowed to be alone behind closed doors with minors at the Sycamore Ward, without supervision; and

      d.   Allowed to direct minors to his office without supervision.

55.     Further included in these failures and breaches, as detailed with greater specificity herein, Defendant Evans and Sister Mel:

      a.   Failed to adequately monitor and supervise the youth group members;

      b.   Failed to report allegations of harassment, either by youth members of the church or Defendant Holyoak;

      c.   Failed to take corrective actions and remove Defendant Holyoak from his

position of trust and authority after Defendant Evans and Sister Mel knew or should have known that he sexually abused and harassed Plaintiff.

***Plaintiff's Economic and Non-Economic Damages***

56.     As a direct and proximate result of Defendants' conduct, Plaintiff has and continues to suffer from substantial emotional and physical distress. As the harassment unfolded, Plaintiff began struggling with bulimia and substance abuse. She did not know why she felt so compelled to act out, she felt completely "out of control." Plaintiff was so emotionally broken that she attempted to commit suicide, though luckily, she was unsuccessful.

57.     When Plaintiff tried to tell her parents about the assault and harassment she faced at the Sycamore Ward, they were similarly convinced that Plaintiff was making it up. Plaintiffs' parents were convinced that Plaintiff was suffering from a mental disorder. Defendant Holyoak encouraged Plaintiff's parents to send her to a Mormon therapist. Plaintiff received so much backlash at the Sycamore Ward and at home, that she abruptly moved out of her home. Plaintiff did not attend her high school graduation because she felt like an outcast. She also did not attend community college, as she had planned.

58.     Plaintiff struggled for years after the assault. In 2003, right after high school, Plaintiff fled her hometown and moved to Georgia.  Plaintiff's perception of sex changed, as she felt that men were only interested in her for her body. Since the assault, Plaintiff has been unable to have a successful romantic relationship because she has severe trust issues—particularly with men. For years, Plaintiff has felt incredibly unstable which has prevented her from holding down jobs for extended periods of time. While Plaintiff was able to curb the bulimia she experienced in the years immediately after Defendant Holyoak's assault, she continued to suffer from body dysmorphia and body image. She lacked confidence and felt incredibly insecure.

18

59.     For years after the assault, Plaintiff did not realize the root cause of all the struggles she was facing. She blamed herself and her mental health—just as she was convinced to do by LDS Church leaders, including Defendant Holyoak and Defendant Evans, and her parents.

60.     In 2005, Plaintiff finally began to understand life outside of the Mormon Church. For the first time in her life, she made close friends outside of the Church, who she was able to confide in and discuss personal details of her life. Through these conversations with her new friends, Plaintiff realized that what she had experienced as a child in the Mormon Church was not normal. Plaintiff began to understand that the LDS Church had created a culture where people were abused and instead of supporting the victims, the abusers were protected for the sake of the Church.

61.     In the years following, Plaintiff continued to reflect on the true nature and impact of the LDS Church. In 2008, Plaintiff finally revisited the years of substance abuse and bulimia that she experienced after the assault by Defendant Holyoak. She realized that these behaviors were a direct response of Defendant Holyoak's assault and the mental abuse she suffered after reporting it. Plaintiff realized that, through bulimia, she was rejecting her own body—a body that she had disconnected with because the abuse she suffered was inextricably linked to her body image. Plaintiff realized that she hated her body—and particularly her breasts—because they allowed people to violate her. Although Plaintiff had also been harassed by other young boys, she realized Defendant Holyoak's assault was most impactful because he was a trusted adult and religious figure.

62.     Plaintiff decided she wanted to rid herself of what had become the daily reminder of the abuse she suffered at the LDS Church, so she saved up for years to afford a breast reduction. Plaintiff got her breast reduction in November of 2016. The procedure was incredibly taxing both

emotionally and physically—and led to Plaintiff having to have three more corrective surgeries. Plaintiff is now left with severe scarring and feels "mutilated." Plaintiff feels that she traded one physical reminder of Defendant Holyoak's abuse for another.

63.     Plaintiff continues to experience a range of mental health issues stemming from her trauma, such as severe emotional distress and physical pain, emotional anguish, fear, humiliation, embarrassment, post-traumatic stress disorder, depression, anxiety, feelings of shame and guilt, anger issues, trust issues, and other physical pain, injuries, damages (both economic and noneconomic), and permanent disability.

64.     The injuries and damages suffered by Plaintiff are specific in kind to Plaintiff, substantial, special, peculiar, and above and beyond those injuries and damages suffered by the public.

**COUNT ONE**
**Negligence**
***Against all Defendants***

65.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other sections of this Complaint as though set forth in this cause of action.

66.     Defendants owed special duties to their parishioners, including Plaintiff, who placed their trust and confidence in their religious organization and its leaders. Defendants also owed a duty to protect the children they voluntarily undertook to care for and supervise in the Youth Program. The duty to protect Plaintiff arose from the special, trusting, confidential, fiduciary relationship between Plaintiff and Defendants.

67.     Due to the special relationship that existed, Defendants owed a duty to adequately supervise and monitor Plaintiff and other students during Youth Program meetings, provide Plaintiff with a safe environment to attend Youth Program meetings, establish policies and

programs that benefit its parishioners, require reporting of allegations of sexual harassment and assault, require corrective action when such reports are made, train employees, including stake presidents and acting bishops, on how to implement these policies and program, and adequately supervise employees to ensure their compliance with these programs and policies.

68. Defendants breached the duties they owed to Plaintiff, both directly and indirectly by way of several acts and omissions. Defendants directly breached the heightened duties of care they owed to Plaintiff by failing to ensure that Plaintiff and other students were properly monitored, train and supervise employees, and enforce proper programs and policies. Defendants failed to ensure that Plaintiff was being properly supervised and monitored during the Youth Program meetings, and as such, Plaintiff was sexually harassed by other youth members on multiple occasions. The LDS Church Defendants, Defendant Evans, and Sister Mel failed to ensure that the presiding Bishop, Defendant Holyoak, was abiding by relevant policies and programs that prevented the sexual assault of minor members in the LDS Church.

69. As the supervisor and principal of the Sycamore Ward's selected leaders, including Defendant Evans and Defendant Holyoak, the LDS Church Defendants are vicariously liable for the breaches of Defendant Evans and Defendant Holyoak. The Sycamore Ward leaders, including Defendant Evans, Defendant Holyoak, and Sister Mel, breached their duties to Plaintiff by allowing her to be subject to sexual harassment, failing to investigate and take seriously Plaintiff's claims of harassment, actively disregarding Plaintiff's accusations of sexual harassment, and failing to take corrective measures to prevent the sexual harassment of Plaintiff. Overseeing Plaintiff and the other youth members of the Sycamore Ward was within the scope of the Sycamore Ward leaders' role at the LDS Church, because their job was to oversee, monitor, and supervise the activities at the church, including the Youth Program.

70.     As a direct and proximate result of the Defendants' conduct, Plaintiff sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment, and other physical and emotional injuries, damages (both economic and noneconomic), and permanent disability, in the past, present, and future, for which this claim is made. The injuries suffered by Plaintiff are substantial, continuing, and permanent.

### COUNT TWO
**Negligence Hiring, Supervision, and Retention**
***Against the LDS Church Defendants***

71.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other sections of this Complaint as though set forth in this cause of action.

72.     The LDS Church Defendants had the authority and ability to hire and select employees and church leaders that served within the LDS Church and/or occupied leadership positions within the LDS Church, such as "Stake President" or "Bishop."

73.     The LDS Church Defendants engaged and retained or otherwise employed Defendant Holyoak, who sexually assaulted and harassed Plaintiff, and Defendant Evans, who dismissed Plaintiff's reports of abuse at the hands of another high-level Sycamore Ward member and other youth ward members.

74.     By virtue of their special relationship with Plaintiff, the LDS Church Defendants owed Plaintiff a duty to reasonably supervise their employees and leadership-occupying members, use reasonable care to investigate these employees and members, and ensure the employees and members were abiding by policies and procedures designed to protect the safety of LDS members who placed their trust and confidence in Defendants.

75.     The LDS Church Defendants knew or should have known that the LDS Church environment created a risk of sexual abuse for children. The LDS Church Defendants knew or

should have known that if their youth members were not properly supervised, they may subject each other to harm, such as sexual harassment. Such Defendants knew or should have known that not properly supervising its leaders, including Bishop Holyoak, could result in him having inappropriate contact with the vulnerable and trusting ward members that relied on him as an important religious figure. The LDS Church Defendants further knew or should have known that if it did not have policies in place regarding the reporting of sexual harassment and assault, or did not effectively enforce such policies, that LDS Church members could be subject to repeated and continuing sexual harassment and abuse.

76.     Despite such knowledge, the LDS Church Defendants negligently failed to supervise, and retained LDS Church employees and leaders, including but not limited to Defendant Holyoak, Defendant Evans, and Sister Mel.

77.     As a direct and proximate result of the conduct of the LDS Church Defendants, Plaintiff sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment, and other physical and emotional injuries, damages (both economic and noneconomic), and permanent disability, in the past, present, and future, for which this claim is made. The injuries suffered by Plaintiff are substantial, continuing, and permanent.

## COUNT THREE
### Childhood Sexual Abuse Pursuant to ILCS 5/13-202.2
### *Against Defendant Holyoak*

78.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other sections of this Complaint as though set forth in this cause of action.

79.     Defendant Holyoak knowingly touched or fondled Plaintiff's breasts through her clothing when she was under the age of 18. Defendant Holyoak did so for the purposes of sexual gratification or arousal.

80.     At the time Defendant Holyoak touched or fondled Plaintiff, she did not consent, nor could she have consented, as she was a minor.

81.     Defendant Holyoak's act of touching Plaintiff's breasts without consent constituted acts of childhood sexual abuse as defined by 735 ILCS 5/23-202.2.

82.     As a direct and proximate result of Defendant Holyoak's conduct, Plaintiff sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment, and other physical and emotional injuries, damages (both economic and noneconomic), and permanent disability, in the past, present, and future, for which this claim is made. The injuries suffered by Plaintiff are substantial, continuing, and permanent.

## COUNT FOUR
### Battery
### *Against Defendant Holyoak*

83.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other sections of this Complaint as though set forth in this cause of action.

84.     Defendant Holyoak willfully perpetrated an act of offensive contact with Plaintiff by touching her breast with his hand.

85.     Defendant Holyoak intended to cause contact with Plaintiff's breast.

86.     As a minor, Plaintiff did not and could not consent to Defendant Holyoak's offensive contact.

87.     As a direct and proximate result of Defendant Holyoak's conduct, Plaintiff sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment, and other physical and emotional injuries, damages (both economic and noneconomic), and permanent disability, in the past, present, and future, for which this claim is made. The injuries suffered by Plaintiff are substantial, continuing, and permanent.

**COUNT FIVE**
**Intentional Infliction of Emotional Distress**
*Against Defendant Holyoak and Defendant Evans*

88.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other sections of this Complaint as though set forth in this cause of action.

89.     Defendant Holyoak's conduct towards Plaintiff, including, touching her breasts without her consent, verbally harassing Plaintiff about the size of her breasts, his repeated failure to take action when Plaintiff reported sexual harassment or assault by Sycamore ward members, and his manipulation of Plaintiff, as described herein, was outrageous and extreme.

90.     Defendant Evans's conduct towards Plaintiff, including, his failure to take action when Plaintiff reported sexual harassment and assault by a leading member of the Sycamore Ward, and his manipulation of Plaintiff, as described herein, was outrageous and extreme.

91.     A reasonable person would not expect or tolerate the complete disregard for safety, well-being, and respect demonstrated by Defendants Holyoak and Evans, especially considering Plaintiff was a minor, and Defendants Holyoak and Evans were respected, trusted, religious figures.

92.     A reasonable parent or guardian would not expect or tolerate the complete disregard of their child's safety or well-being, especially when attending a religious organization's youth program.

93.     Defendants Holyoak and Evans intended to cause Plaintiff emotional distress, or at a minimum, acted with reckless disregard of the probability that Plaintiff would suffer humiliation, mental anguish, and emotional distress.

94.     As a direct and proximate result of Defendants Holyoak's and Evans's conduct, Plaintiff sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety,

humiliation, embarrassment, and other physical and emotional injuries, damages (both economic and noneconomic), and permanent disability, in the past, present, and future, for which this claim is made. The injuries suffered by Plaintiff are substantial, continuing, and permanent.

## PRAYER FOR RELIEF

95.    For these reasons, Plaintiff prays for judgement against Defendants as follows:

    a.    For special damages, according to proof;

    b.    For past and future general damages, including physical pain, mental anguish, disfigurement and physical impairment, according to proof;

    c.    For past and future lost earnings and/or earning capacity, according to proof;

    d.    For medical expenses, past and future, according to proof;

    e.    For punitive and exemplary damages, according to proof;

    f.    For prejudgment interest from the date of Plaintiff's assault to the date of judgment, as provided by law, according to proof at the time of trial;

    g.    For costs of litigation incurred herein;

    h.    For attorney's fees;

    i.    For such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial for all Counts for which a jury trial is permitted by law.


DATE: November 15, 2024           Respectfully submitted,


                            */s/ Jason J. Friedl*
                            Jason J. Friedl (Bar No. 6273533)
                            **ROMANUCCI & BLANDIN, LLC**
                            321 North Clark St., Suite 900

Chicago, IL 60654
Tel.: (312) 815-2326
Fax: (312) 458-1004

Tracey B. Cowan (*Pro hac vice* application forthcoming)
Ryan J. Clarkson (*Pro hac vice* application forthcoming)
Shireen M. Clarkson (*Pro hac vice* application forthcoming)
Sara Beller (*Pro hac vice* application forthcoming)
Olivia E. Davis (*Pro hac vice* application forthcoming)
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Tel.: (213) 788-4050
Fax: (213) 788-4070
*Attorneys for Plaintiffs*